## Jennings v. Commonwealth.

(Decided December 15, 1925.)

### Appeal from Breathitt Circuit Court.

1. Homicide—Evidence Sustains Manslaughter Conviction.—Evidence held to sustain conviction of manslaughter.

2. Criminal Law—Conviction Not Reversed as Against Evidence, Unless Story of Commonwealth is Highly Improbable.—Supreme Court will not exercise power of setting aside conviction as flagrantly against evidence, on ground that numerical weight of testimony favors accused, unless story told by witnesses for Commonwealth appears on face, or by physical facts and circumstances, to be highly improbable.

3. Criminal Law—Question Asked Father of Defendant Whether he Had Previously Cut Deceased Held Not Prejudicial in Form.—In prosecution for murder, where defense was that deceased attempted to cut defendant because defendant's father had cut deceased, question asked defendant's father whether he had previously cut deceased was not prejudicial in such form, though witness might more properly have been asked whether he had had a previous difficulty with deceased.

4. Witnesses—Evidence of Difficulty Between Defendant's Father and Deceased Held Admissible to Show Bias of Defendant's Father.—In prosecution for murder, where defense was that deceased attempted to cut defendant because defendant's father had cut deceased, evidence that defendant's father and deceased had a previous difficulty was admissible on question of bias of defendant's father, and it was not error to exclude from jury details of such difficulty.

5. Criminal Law—Action of Trial Court in Calling Special Venire from Another County is Not Subject to Review.—Under Criminal Code, section 281, providing that decisions of court on challenges

to panel and for cause shall not be subject to exception, action of trial court in calling special venire of jurors from another county under Criminal Code of Practice, section 194, is not subject to review.

6. Criminal Law—In Absence from Record of Affidavit Refuting Contention of Relationship between Jurors and Commonwealth's Attorney, Affidavit is Presumed to have Been Sufficient to Sustain Refusal of New Trial on Ground of Jurors' Bias.—Where transcript disclosed that Commonwealth's attorney filed a counter affidavit to defendant's contention that a juror was a tenant of attorney, and other jurors were distantly related to him, and affidavit was not in record, it is presumed to have been sufficient to sustain court's refusal of new trial on ground that jurors were biased.

A. F. BYRD and A. H. PATTON for appellant.

FRANK E. DAUGHERTY, Attorney General, and GARDNER K. BYERS, Assistant Attorney General, for appellee.

## Opinion of the Court by Judge Clay—Affirming.

In the month of April, 1916, appellant shot and killed John Haddix in the town of Jackson. On the next day he was indicted for murder by the grand jury of Breathitt county. The first three trials resulted in hung juries. On his fourth trial he was convicted of manslaughter and his punishment fixed at six years' imprisonment.

It is first insisted that the verdict is flagrantly against the evidence. The homicide occurred about two or three o'clock in the morning in a restaurant conducted by appellant's father. Orville Gose, the first witness for the Commonwealth, testified that he and appellant were together up to the time of the shooting. Appellant had been drinking. Before going into the restaurant they were on a horse. When they got off the horse appellant fired his pistol and then went into the restaurant. In a few minutes witness also went into the restaurant. At that time appellant was behind the counter. A few minutes later appellant got into an argument with some strangers about the playing of a French harp. At that time John Haddix, the deceased, was in the restaurant. When the witness turned around all the fellows began running out the door. Appellant had his pistol out and witness grabbed him to prevent trouble. Appellant jerked the pistol out of his hand, fired and struck John Haddix. At that time Haddix was about fifteen feet

away and was not doing anything. When he fell Haddix was only four or five feet from the door: He did not remember what appellant said before he fired. Witness went to Haddix and Haddix said, "What did he want to shoot me for?" Appellant then went out the door. In about fifteen minutes appellant returned. He did not see any blood on appellant's face. At the time the pistol was fired witness was not looking at appellant or Haddix. Willard Stacy testified that he was not present when the shot was fired. He saw appellant fighting with two strange men. John Haddix was not taking any part in the scuffle. He heard the rest running and he ran out. As he went out he passed Haddix who was six or seven feet, or maybe ten feet, from the door. After the shot was fired he returned. Haddix was lying on the floor and Orville Gose was in there. Not long after, appellant came in. He saw no blood nor wounds on his head. Appellant said that Haddix was not hurt. When appellant returned he had a knife in his hand. He did not know what appellant did with the knife. Some time prior to the difficulty he heard several shots in front of the restaurant. When appellant came in he had a pistol in his hand. He went behind the counter and put some cartridges in his pistol. So far as he knew Haddix was sober and appellant was laughing. He saw appellant take one drink and believed he was drunk. Before he left he saw Orville Gose in the room. Tommy Hall was not in the restaurant when Haddix was shot. He was there when appellant struck a boy by the name of Combs. Appellant pulled his pistol from behind him and Orville Gose grabbed it and told the boy to run. They all ran and he got about fifty feet from the restaurant when he heard the shot. As he went out John Haddix was about four feet from the door. When he returned Haddix was lying near the door. Before John Haddix was shot there was some shooting on the outside. Appellant fired the shots. After that appellant came into the restaurant and loaded his pistol. As he ran out of the restaurant Orville Gose had hold of appellant. After he heard the shot fired in the restaurant he returned. At that time Willard Stacy, Orville Gose, appellant and John Haddix were there. John Haddix was lying about four feet from the door. Haddix said, "I don't see what Fred killed me for." He looked at Fred and didn't see any wounds or blood about his face or hands. Appellant looked like a scared man. In his opinion appellant was drunk. Dr.

Wilgus Back, to whose hospital the deceased was carried, testified that the shot struck deceased just to the right or left of the breast bone, then struck the spinal cord and caused paralysis from his waist down. When Lillie Ball went to the hospital she found John Haddix lying on a cot. She asked John if he was hurt and he said "Yes, I am killed." He lived about three days. He always said that he could not get well. John said that he was in the building and heard some shooting outside. When he went to the front to see who was out there Orville Gose and Fred Jennings were on a horse. Fred got down and came in the house with the cylinder of his gun "throwed" and asked for some more cartridges. While outside he lit a cigarette and heard a voice calling him. He recognized it as Fred Jennings' and when he went back in two strange fellows and Fred seemed to be in an argument. He turned around and said, "Boys, don't have any trouble here, we'll all be arrested." Thereupon Fred turned around and said, "What have you got to do with it? I will burn you." When he said that Fred shot him. Daniel Haddix, the father of John Haddix, saw his son at the hospital. John said he was killed; that he was over at the Jennings restaurant that night and heard some shooting on the outside. On going out to see what occurred Fred Jennings and Orville Gose came right up on a horse and fired three or four shots. Fred then came into the house throwing the hulls out of his gun and called on Domineck, who was working there, for more cartridges. He secured two or three cartridges, reloaded his gun and called for a glass of whiskey. He then got into a wrangle with some of the river boys and hit one in the face with a French harp. Orville Gose jumped up and grabbed Fred and told them to run. They went scattering out of the house. He ran out in front and told Fred not to do that as he would get them all in jail. Fred said, "God damn you, if you don't get by, I will burn you," and dropped his pistol down and fired. On being recalled by the Commonwealth Willard Stacy testified that when he returned to the restaurant after the shooting there was a knife lying on the floor beside John Haddix. He also saw appellant with a knife. He didn't know whether appellant had the knife when he came in or not. According to his best judgment the knife which Fred had was the same knife that he saw on the floor.

On the other hand, appellant testified that the restaurant was kept open day and night. He worked there at night, but sometimes went to the picture show early in the evening. He was away that evening and returned about eleven o'clock. After that he was gone for a few minutes. His assistant was Domineck Armigeto. When he returned to the restaurant about 12:30 there were several in there. He never saw Orville Gose or Tommy Hall. Some boy wanted him to play the French harp and he told him he could not play. The boy was pretty full. When he first got back the little Greek told him that Haddix had bought an order and not paid for it. He never saw Haddix until about 3:15 or 3:30. Haddix came in and told Domineck that he had come by to clean up the God damn place; that he was going to paint it red and go to Middletown, Ohio. At that time he was at the end of the counter by a little thread box he called his desk. Haddix said, "Fred, I am going to cut you, your God damn daddy cut me." Haddix cut his finger and he dodged behind the counter. Haddix then cut him on the side of the head. He had a gun under the counter, grabbed it and shot. At the time he did so Haddix was cutting him. After shooting he never had any knife in his hand. His hand was cut and also the side of his head. Dr. Hogg dressed his wounds. James J. Jennings, appellant's father, came into the restaurant shortly after the shooting. When he came in Haddix was there, also Rufus Miller. Haddix had a knife in his right hand. It was a four bladed knife and all the blades were broken out except one big blade, and one side of the handle was off. He never saw Fred until the next morning. At that time his head and hand were dressed. Before that time witness had cut John Haddix. Two of them were on him at the time. Norman Smith testified that he was in the restaurant and there were ten or fifteen in there. He saw appellant standing at the end of the counter; heard Haddix come up with a knife; heard some words about getting revenge because his daddy had cut him. When he saw this he went out of the restaurant. William Mullins saw John Haddix the night of the difficulty and John was drunk. Haddix said, "Let's get drunk and police this damn place up. We're leaving for Middletown and these damned people have no use for me and I have no use for them." He also said that Jennings and him had had a fight and Jennings had cut him up with a knife, and that he was

going to get drunk and clean the damn joint out. Rufus Miller was present at the time of the difficulty. If he saw Orville Gose there he didn't remember. Orville did not at any time grab Fred Jennings' arm when he had a pistol in his hand. John Haddix ordered something and would not pay for it. John said that old man Jennings had cut him once with a knife and he was there to get revenge. He was leaving the next morning for Middletown and was going to have it out before he left. Fred told him he could pay for the order the next day. John said, "By God, I will never pay for it." John had a knife in his right hand. He made two strikes at Fred and then the pistol fired. When Fred shot, John was trying to cut him with a knife. After John fell he went to him. Orville Gose was not with him and did not come to him. Will Tharp was at the restaurant when the difficulty occurred. He heard John tell Fred that he was going to cut him. John struck at Fred two or three times. The second time he saw Fred's hat rise up. He then started to run and when he got to the middle of the door he heard the pistol fired. There were several persons there. L. T. Davidson, who was city marshal at the time, came to the restaurant about thirty minutes after the difficulty. When they picked up the deceased they found an ordinary pocket knife lying under him. The knife was open, but there was no blood nor hair on it. Ben Harrison was present when the man was shot. There was some talk about a man not paying them and Fred said that would be all right. He saw a man strike at Fred twice. One time he struck him over the forehead, but he did not see any knife in his hand. Harry Oliver was present and heard John Haddix say, "I am going to Middletown in the morning. I am going to paint this God damn place red." After that he heard him go up to Fred and say, "I am going to cut you, your daddy cut me." Fred said, "John, you are drunk; go home and go to bed." John said, "No, I am going to cut you; your daddy cut me," and struck at him with a knife twice. Fred then came up with a pistol and a shot was fired. When the shot was fired John was cutting Fred. Boone Spencer was also present and heard John say, "Your daddy cut me and I am going to cut you; I am going to leave in the morning and I am going to burn this place up." Witness then started upstairs and at that time John Haddix was coming at Fred. Jim Lee testified that he was present when John

said that Jim didn't like him; that he was going to tear the damn place up and pile it out of doors, get on the train and go to Middletown.   James Spencer was with John Haddix the night before the killing.   John said that he and old man Jennings had had trouble and that he was going to raise a row up there with them and tear up the place.   Tom Allen, an uncle of appellant, said that appellant came to his house about four o'clock in the morning after the difficulty.   At that time appellant had a cut on his head.   Chester Jennings also saw a cut on appellant's hand and one on his head, the morning after the difficulty.   Charley Jennings, appellant's brother, testified to the same effect.   Jack Little was present on the night of the trouble, saw John Haddix go to where Fred was and then curse him. Fred told him to keep quiet.   John said, ''Maybe you had better put me out.''   Fred said, ''I don't want to put you out, but you must keep quiet.''   John had a little knife in his hand and said, ''If you fool with me, I'll cut your damn throat,'' and made a lick at Fred. Fred ran under the counter.   John struck at him over the counter with the knife, and as Fred came out he shot him.

In rebuttal, A. A. Allen, who was jailer of Breathitt county at the time, did not notice any cut places on appellant when he took him in.   Mike Robinson did not think Jack Little's reputation was real good; was also of the opinion that the reputation of Tricky Bill Tharp and Rufus Miller was bad.   In the opinion of Jason Morris, Tricky Bill Tharp's reputation at the time he testified was good so far as he knew.   J. D. Jones testified that Jim Lee was in his son's barber shop the day before and said that he was glad that he didn't know anything about the case.   He also stated that Tricky Bill Tharp's reputation was bad.   Daniel Haddix testified that about a week after the homicide Jack Little told him that he was so drunk that he didn't know anything about the difficulty.   W. L. Eversole, a merchant, said that all he had ever heard about Jim Lee was good. Robert Robertson said that Mike Robinson's general moral reputation was bad.

It will be seen from the foregoing *resume* of the evidence that the evidence for the Commonwealth tends to show that appellant shot the deceased when deceased was some distance away and making no effort to harm him.   On the other hand, the evidence for appellant is to

the effect that deceased was actually cutting him with a knife at the time the shot was fired. For the Commonwealth Orville Gose is the principal witness. He is largely corroborated by the dying declarations of the deceased and is corroborated in part by Stacy and Hall. There is further evidence that some of the witnesses who saw appellant after the homicide did not observe any blood or cuts on him. On the other hand, appellant's version of the affair is corroborated by some seven or eight witnesses who claim to have been present and to have seen the entire difficulty and who further testified either that Orville Gose was not there or that they did not remember seeing him. While we are at liberty to set aside a conviction on the ground that the verdict is flagrantly against the evidence, in view of the well settled rule that the credibility of the witnesses is for the jury, we are not inclined to exercise that power on the ground that the numerical weight of the testimony favors the accused unless the story told by the witnesses for the Commonwealth appears on its face to be highly improbable or is shown to be such by the physical facts and circumstances.

While appellant's father, J. J. Jennings, was on the stand he made the following answers to the following questions:

"Q. Had you before that time cut this boy John Haddix?

"A. About two or three years we had trouble, two of them on me and one on myself.

"Q. I asked you did you cut him?

"A. That is what I am telling you."

Afterwards the witness was recalled by appellant for further examination and asked to tell what John Haddix had done to him before he cut Haddix. An objection was sustained to the question and an avowal made that witness would testify that he had cut Haddix after Haddix and another man had held him up and Haddix had assulted him with brass knucks. At the same time counsel for appellant asked the court to instruct the jury not to consider the fact that Jennings had cut John Haddix, which the court refused to do. Thereupon the court told the jury that they could consider the fact that at a former time the witness had cut John Haddix in a difficulty between them without having submitted to them any of the details as to which of the two

was justified in that encounter. The evidence that the witness and Haddix had had a previous difficulty was admissible on the question of bias and the court did not err in excluding from the jury the details of that difficulty. Doubtless it would have been the better practice to ask the witness whether or not he had had a previous difficulty with Haddix, rather than whether he had cut Haddix. However, the putting of the question in that form and the answer thereto were not prejudicial in view of the fact that appellant's whole defense was based on the claim that Haddix assaulted and attempted to cut appellant because appellant's father had cut him.

The further point is made that the court erred in sending to another county to get a jury without first having made an effort to obtain a jury in Breathitt county, as required by section 194, Criminal Code. In reply to this contention it is sufficient to say that we have held in numerous cases that in view of section 281, Criminal Code, which provides that the decisions of the court upon challenges to the panel, and for cause, shall not be subject to exception, the action of the trial court in calling a special venire of jurors from another county under Criminal Code of Practice, section 194, is not subject to review. Moseley v. Commonwealth, 84 S. W. 748, 27 Ky. Law Rep. 214; Howard v. Commonwealth, 118 Ky. 1, 80 S. W. 211, 81 S. W. 704; Sergent v. Commonwealth, 133 Ky. 284, 17 S. W. 362; Logan & Tribble v. Commonwealth, 174 Ky. 80, 191 S. W. 676; Thomas v. Commonwealth, 200 Ky. 591, 255 S. W. 276; Marcum v. Commonwealth, 20 Ky. 527, 257 S. W. 714.

There is the further contention that one of the jurors was a tenant of the Commonwealth's attorney and that two of the jurors were distantly related to him. Whether, if this condition of affairs had existed, it would have afforded ground for reversing the judgment, we need not determine. The transcript discloses that the Commonwealth's attorney filed a counter affidavit. The affidavit is not in the record and in its absence it will be presumed to have been sufficient to sustain the court's refusal of a new trial on the ground that the jurors were biased.

Judgment affirmed.