## Karnes v. Commonwealth.

(Decided May 31, 1932.)

HURT & HURT and GORDON MONTGOMERY for appellant.

BAILEY P. WOOTTON, Attorney General, and FRANCIS M. BURKE, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY JUDGE CLAY—Affirming.

This is an appeal from a judgment convicting appellant of manslaughter, and fixing his punishment at two years' imprisonment. The only ground relied on for reversal is that the verdict is not sustained by the evidence.

The homicide occurred Sunday afternoon, March 22, 1931, at Robert Hatcher's store in Adair county, where several persons had congregated. According to Richard Lane, the brother of Charlie Lane, who was killed, appellant, William Gilpin, and Charlie Lane entered the store in front of him. He had a watch fob with a little knife on it. When he had gone about three feet from the door, Bob Hatcher grabbed at the knife after saying that he had been wanting it for a long time. Bob grabbed the watch fob and broke the ring out of his watch. After picking the knife and ring up, he took Bob's pipe out of his mouth. After some words between them, his brother, who was standing in the back end of the store, said, "Stick to him, don't let the Hatchers run over you." At that time Arthur Hatcher was coming onto his brother with a meat knife, and Bob ran behind the counter and grabbed a shotgun and pointed it at his brother. Thereupon witness pulled his pistol and told Bob to drop the shotgun, which he did. He then threw the pistol on Arthur Hatcher and told him to drop the knife. They then started out. About that time a car arrived and stopped in front of the store. Somebody said, "Don't go in there, there's trouble in there." Harlan Hatcher, who was with appellant, said, "Trouble, hell, trouble is what we're looking for." Harlan ran in the front door, stepped to the side, and appellant ran right in behind him. Charles Lane was back next to the stove. Appellant put his pistol against Charles and pulled the trigger. The gun snapped two or three times, and appellant ran backwards. Appellant had gotten one foot on the floor of the store and the other outside. When he looked back at Charles, appellant had his pistol in both hands and fired.

William Gilpin, who claimed to have witnessed the shooting, testified that as the Lane boys went out Karnes and Harlan Hatcher drove up in a car. Urisa Page said, "Don't go in there, they have been having trouble in there." One of them said, "Trouble, hell, trouble is what we're looking for." As Karnes went in, he had a

pistol in his hand. Karnes put his pistol against Charles and commenced snapping it. He then backed out the rear door, pulled the hammer on his pistol, and fired. Mrs. Lou Cat Skaggs did not "exactly see the shooting," but heard the report. Karnes was out before the back door when he shot. Karnes had his hand thrown out when she saw him. Karnes was pointing it at the door. What caused her to notice the trouble was that she saw two boys standing up at the upper end of her crib, and they were peeping around the corner of her crib. The boys were William Gilpin and Urisa Page.

Urisa Page left after the first difficulty and met Karnes and Harlan Hatcher in the pike. They asked him what was the matter in the store, and he told them there was trouble. One of them said, "That is what we're looking for." It was fifteen or twenty minutes before any shooting took place. He saw Karnes standing on the back doorstep and the smoke rise from there. Karnes tried to get him to make the statement that he was behind the crib when Karnes drove up.

J. H. Burris was with the deceased about two hours before his death. After stating that the deceased said he was certain that he would not get well, he testified to the following statement made by the deceased:

"A. He said he was out at Bob Hatcher's and said he started out the door—didn't know Joe Ed was there—and Joe Ed run up and jumped out of a car and run right up and snapped a pistol at him. He said he said to Joe Ed 'What do you want to shoot me for?' Said the pistol snapped and Joe Ed jumped backwards and snapped the pistol again and it fired. Said he didn't know Joe Ed was on the place."

John Lane, brother of deceased, testified that shortly before his death the deceased stated that Joe Ed ran in, snapped a gun at him, backed out the back door, and stood on the step and shot him, and that he (the deceased) was not doing anything but putting the baking powder and tobacco in his pocket. Jim Burris, who was present testified to the same effect.

On the other hand, appellant testified that when he, with Harlan Hatcher, arrived at the store, he saw Urisa Page and William Gilpin standing behind Miss Lou Cat Skaggs' crib. Neither of them made any inquiry as to

what was going on, and neither said, "Trouble is what we're looking for." When they entered the store, Uncle Bob Hatcher and Arthur Hatcher were behind the counter. Charlie Lane was at the end of the counter striking at Uncle Bob with a knife, and Richard Lane was standing across the counter with a pistol cocked. When he inquired what the trouble was, Charlie Lane said, "What in the God damn hell have you got to do with it?" He said, "Nothing more than to get it stopped." At that Charlie told him to get out, called him a vile name, and said, "I am going to cut your head off." Charlie made at him with a knife, and he commenced backing trying to get out. Charlie hit at him, and he backed to the door and had his hand on the door knob. Charlie drew back to make a lick, and he pulled his pistol out, threw the pistol down on him, snapped it once or twice, and then fired. He told Charlie not to come on him with the knife, and believed it was necessary to shoot Charlie in order to save his life. On cross-examination, he stated that he went back where Charlie was within ten or twelve feet of him. At that time Charlie had not struck him with a knife. He was by the stove when Charlie first struck at him. Charlie struck at him once or twice. He thought Charlie struck at him at some other time than when he was right by the stove. That was when Charlie was between the stove and the back door. Charlie was pretty close to him when he struck at him at the stove. He thought Charlie was going to cut him, and he jumped. He was going backwards, and Charlie was coming right after him. He guessed Charlie was traveling as fast as he was. When he shot Charlie, Charlie was coming over with the lick.

After describing the first difficulty, Robert Hatcher testified as follows: Charles Lane was standing striking at him with a knife. Joe Ed Karnes came in and asked what was the trouble. After some words Charlie said, "I'll cut your God damn head off," and started after Joe Ed. Joe Ed backed to the rear door with Charles crowding him. Joe Ed had his hand on the door when the pistol fired. Joe Ed then backed out the door. Charles cursed him, turned, and walked out the front door. Richard then dropped his pistol and went on out the front door. Ethridge Curry, Harlan Hatcher Arthur Hatcher, and William Rogers testified to the same effect.

From the foregoing resume of the evidence it will be seen that on the one hand it was shown that, when Karnes and Harlan Hatcher entered the store they were apprised that trouble was going on, and one of them said, ''Trouble is what we're looking for,'' and that, omitting the testimony of William Gilpin, who, it is claimed, was some distance away, the evidence of Richard Lane and the dying declarations of the deceased were to the effect that, at the time appellant shot the deceased, the deceased was not advancing on him with a knife. On the other hand appellant's version of the affair is that deceased first struck at him with a knife, that he backed to the rear door and deceased was advancing on him with the knife when he fired the shot, which version is corroborated by the evidence of Robert Hatcher, Ethridge Curry, Harlan Hatcher, Arthur Hatcher, and William Rogers.

If, under the law, we could decide criminal cases in accordance with the preponderance of the evidence, there might be some merit in appellant's contention that he is entitled to a reversal, but that is not the rule. While we are at liberty to set aside a conviction on the ground that the verdict is flagrantly against the evidence, yet, in view of the well-settled rule that the credibility of the witnesses is for the jury, we are not inclined to exercise that power on the ground that the numerical weight of the testimony favors the accused unless the story told by the witnesses for the commonwealth appears on its face to be highly improbable, or is shown to be such by the physical facts and circumstances. Jennings v. Commonwealth, 213 Ky. 190, 280 S. W. 1086. No such situation is disclosed by the evidence. The main question for decision by the jury was whether the deceased was or was not advancing on appellant with a knife at the time the fatal shot was fired. The evidence that he was not was not inherently improbable, or shown to be improbable by the physical facts and circumstances. In short, the case is one where the jury had the right to conclude from the evidence that appellant, who had reached the door of the grocery, was not in any immediate danger, real or apparent, at the hands of the deceased when he fired the fatal shot. In the circumstances we cannot say that the verdict was flagrantly against the evidence.

Judgment affirmed.